## KELLY v. UNITED STATES.

Court of Claims.   February 17, 1930.

No. J–229.

769

Benjamin B. Pettus, of Washington, D. C., and Walter E. Ernst, of New York City (H. C. McCollom, of New York City, and Colladay, Clifford & Pettus, of Washington, D. C., on the brief), for plaintiff.

Dan M. Jackson and Wm. P. Montgomery, both of Washington, D. C., and Herman J. Galloway, Asst. Atty. Gen., for the United States.

Before BOOTH, Chief Justice, and GREEN, WILLIAMS, LITTLETON, and GRAHAM, Judges.

GREEN, Judge. Plaintiff in this case brings suit to recover $2,200,000, being damages alleged to have been sustained by reason of an eviction from premises leased from the government on the West Point Military Reservation.

It appears from the evidence in the case that the Thayer-West Point Hotel Corporation is the assignee of a lease obtained in 1924 from the government for the site of a hotel upon the reservation above referred to, and that this lease provided that the lessee should construct a hotel thereon. The lease recited that the lessee " * * * agrees to observe, and cause to be observed, all rules and regulations now established or which may hereafter be established by the Superintendent of the Military Academy at West Point so far as the same apply to or affect the leased premises."

The lease also provided that, when it should come to an end, either by the expiration of the term reserved, or the cancellation or annulment thereof by the Secretary of War, the United States bound itself to pay "just compensation * * * for the construction of said hotel, appurtenances, and equipments" thereof. Under this lease in 1925 and 1926, the Thayer-West Point Hotel Corporation constructed on the reservation a hotel adapted to receive a high-class patronage. The government reservation upon which the West Point Military Academy is located comprises over 2,000 acres. Access is afforded to it by state roads leading to both the north and south entrances thereof, as well as one toward the western side. A main roadway passes through the reservation from the south gate along the eastern side of the reservation, and on the north part thereof, turning to the west, connects again with the highway on the western part of the reservation which passes out through the north gate thereof. A short distance from the south gate this main roadway passes the site where the hotel was constructed, 138 feet therefrom. The West Point Academy is visited by large numbers of people interested in the cadets or the institution itself, and after the advent of the automobile a very great number of people traveling either north or south passed through the reservation on their journeys. All of this traffic became a source of much trouble to the officials of the academy and interfered to a greater or less extent with its operations. Consequently, an order was promulgated by the superintendent that through traffic should be diverted. Notice was, however, given that all visitors to the academy and all those who desired to go to the hotel would be admitted. There was some misunderstanding of this order, and, for various reasons that need not be recited here, some people supposed that access to the hotel was denied; but, on the contrary, sentries and gatekeepers were specially instructed to inform people who desired to enter that they could go to the hotel if they wished. As a result of the order, traffic on the main roadway in front of the hotel was decreased about 80 per cent., but there is no direct evidence as to how this affected the business at the hotel. It may, however, be presumed that it had some effect in decreasing it. The hotel corporation opened the hotel on June 3, 1926, and oper-

ated it at a loss until January 3, 1927, when it was closed by the hotel corporation. The principal cause of this operating loss was the fact that the hotel was new. The corporation again commenced the operation of the hotel May 3, 1927, and continued the operation thereof until August 12, 1927, when possession of the hotel and its appurtenances was taken by receivers appointed in an action begun to foreclose a second mortgage on the hotel premises, and the receivers commenced the operation of the hotel. These receivers discontinued the operation of the hotel on November 2, 1927, but a watchman was left in charge of the building and its contents. In May, 1928, an action having been brought to foreclose a first mortgage on the hotel, the court appointed receivers therein who were directed to, and did, take possession, reopened, and commenced the operation of the hotel, and are now operating it. On August 16, 1927, the hotel corporation was adjudicated to be a bankrupt through proceedings in involuntary bankruptcy against it, and later the plaintiff herein was appointed trustee in bankruptcy. Receivers were also appointed for the hotel property. These receivers never took possession of the hotel, but did take possession of some property which they were subsequently ordered to pay over to the receivers appointed by the state court. This property was turned over to the plaintiff, and the receivers in bankruptcy were discharged.

Upon these facts, which are alleged in the petition and found by the court, the plaintiff alleges that the hotel corporation for which he is a trustee in bankruptcy was ousted from the hotel property by a constructive eviction on the part of the defendant, and that, being deprived of the use of the hotel property, is entitled to recover damages in the amount of its cost.

■ This evidence we think furnishes many reasons for holding that there was no constructive eviction. The defendant's agents in no way obstructed the means of access to the hotel when they diverted through traffic from the roadway which passed in front of it. Counsel for plaintiff cite about 20 cases holding that an obstruction of a substantial character to the means of access of the lessee to the leased premises constitutes such breach of the express or implied covenants of the lease as to render the lessor liable therefor. The limitations of an opinion forbid a separate discussion of these cases, but in general it may be said that the obstructions under consideration therein were direct and interfered with the opportunity for access to the leased premises. Moreover, there are many acts which will constitute a breach of the covenants of the lease which do not constitute an eviction, constructive or otherwise.

Tallman v. Murphy, 120 N. Y. 345, 24 N. E. 716, 718, is cited on behalf of plaintiff, in which it was said: "'An "eviction" is defined to be where there has been an obstruction to the beneficial enjoyment of the premises, and a diminution of the consideration of the contract by the acts of the landlord.' McAdam, Landl. & Ten. 478, 479." But we do not think it was intended therein to hold that anything which the lessor did which might lessen the profits which the lessee could make from the leased premises constitutes a constructive eviction, for there are an abundance of authorities to the contrary when the act complained of does not interfere in any way with the use and enjoyment of the premises. It will be observed in this case that what the plaintiff complained of is not an act which interfered in any way with the hotel corporation using the premises. What the defendant did was to restrict the right of third parties to pass by the hotel on their way through the reservation, and thereby it is claimed the patronage of the hotel corporation was lessened, although there is no evidence as to the extent that this interfered with the hotel's business and some dispute in the evidence as to whether excluding the through traffic might not ultimately be of benefit to a high-class hotel, such as the one involved in this case. In 36 C. J. 262, § 988, it is said: "It is necessary, however, in order to constitute a constructive eviction, that the landlord, by some intentional act or omission, materially and permanently interferes with the beneficial enjoyment or use of the demised premises or a material part thereof."

■ We think it quite clear that the evidence does not bring the acts of the defendant within this definition. The exclusion of the through traffic from the road passing in front of the hotel did not "materially interfere with the beneficial enjoyment or use of the demised premises." All we can conclude from the evidence is that as a matter of common knowledge the revenues of the hotel were probably somewhat decreased, but there is no evidence that any act on the part of defendant's agents interfered with the enjoyment of the leased premises. The evidence shows that defendant's agents took special pains to inform parties who approached the reservation for the purpose of entering it that if they desired to go to the hotel they could do so; and it seems to be well settled that, in order to constitute a constructive eviction, acts or

omissions of a landlord in interference with his tenant's use and enjoyment must indicate an intention on his part that the tenant shall no longer continue to hold and enjoy the demised premises. See authorities cited in 36 C. J. 263, § 989, note 57. This, we think, is one of the points which distinguishes the acts which constitute a constructive eviction from those which are merely a breach of some of the covenants of the lease, either expressed or implied, and which might afford a foundation for a suit in damages.

There is still another and, as we think, equally conclusive reason why there was no constructive eviction in this case. Ordinarily, there can be no constructive eviction unless the premises are abandoned within a reasonable time, and this abandonment must be complete. It has even been held in some cases that the fact that the tenant actually does leave the property is not sufficient, but it must be shown that his abandonment of the premises was because of the circumstances alleged to constitute the constructive eviction. See 36 C. J. 264, § 990, and cases cited under notes 70 and 71. It is quite clear that in this case there was no abandonment of the premises in any proper sense, much less an abandonment on account of the matters stated as the grounds for claiming a constructive eviction. Ever since the construction of the hotel and up to the present time, the lessee of the hotel—namely, the hotel corporation or some person claiming under a right granted by it—has been in possession of the hotel premises. A portion of the time the hotel has not been operated, but some one either representing the hotel corporation, or some one claiming through or under it, was in charge thereof. The second mortgagee first took possession from the hotel corporation through receivers appointed in the foreclosure action, and the second mortgagee was in turn obliged to surrender possession to receivers appointed in a foreclosure proceeding upon the first mortgage, and these receivers are still in possession and operating the hotel. We must presume that these proceedings were regular and in accordance with the provisions of the mortgages and the laws of the state. It would be a strange rule indeed that would hold that a constructive eviction had taken place when the tenant's grantees still remained in possession of the premises, and the lease still remained in force and effect. We think it obvious there can be no constructive eviction under such circumstances. To hold otherwise would make the lessor liable in damages for ousting the tenant when the lessor was not able to obtain possession of the premises leased. The possession of plaintiff's grantees cannot be reconciled with a constructive eviction upon any logical principles.

It follows that the plaintiff's petition must be dismissed, and it is so ordered.

BOOTH, Chief Justice, and WILLIAMS, LITTLETON, and GRAHAM, Judges, concur.